IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| J. WADE BROWNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-0283-N |
| | § | |
| CLARENDON NATIONAL | § | |
| INSURANCE COMPANY and | § | |
| HCC GLOBAL FINANCIAL | § | |
| PRODUCTS, LLC, | § | |
| | § | |
| Defendants. | § | |

## ORDER

This Order addresses Defendants Clarendon National Insurance Company ("Clarendon") and HCC Global Financial Products, LLC's ("HCC") motion for summary judgment [14]. For the reasons provided below, the Court grants the motion that the Manning Arbitration claims are time barred, and thus the associated Insurance Code claims fail, and otherwise denies the motion with respect to the NASD Enforcement Proceeding.[1]

### I. ORIGINS OF BROWNE'S CLAIMS

This case arises out of an insurance coverage dispute. Clarendon issued a Directors, Officers and Private Organization Liability Insurance Policy (the "Policy") to e2 Communications ("e2"), a Dallas-based software company. The Policy, administered by

---

[1]The Court grants Plaintiff J. Wade Browne's motion for leave to file a response to the Defendants' supplemental reply brief [32].

HCC,[2] indemnified insured persons against loss – including defense costs – arising from claims for "wrongful acts."  Pl.'s App. at 27 [23].  Browne, an insured person under the policy, seeks to recover attorneys' fees associated with claims filed against him during the policy period.

### A. The Underlying Claims Against Browne

Beginning in April 1999, J. Wade Browne served as an Advisory Director of e2. According to Browne, one of his duties in his capacity as Advisory Director was to introduce potential investors to the principals at e2.  e2 compensated Browne for his service as Advisory Director with stock and stock options.

At the same time that Browne served as an Advisory Director of e2, he also acted as a registered securities representative with PaineWebber, Inc.[3] and Lehman Brothers.[4]  Both firms were members of the National Association of Security Dealers, Inc. ("NASD"). NASD, now known as the Financial Industry Regulatory Authority ("FINRA"), regulates a wide range of securities firms across the United States.  It requires an associated person to "observe high standards of commercial honor and just and equitable principles of trade."  *See* NASD Rule 2110.  In addition, it requires any associated person who intends to participate

---

[2]Plaintiff concedes that he has no claims against HCC.  *See* Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. at 3.  Accordingly, the Court grants summary judgment in favor of HCC.

[3]PaineWebber, Inc. is now known as UBS Financial Services Inc.  It was formerly known as UBS PaineWebber Inc.  The Court refers to the organization collectively as "PaineWebber."

[4]Browne sought and obtained approval for his position at e2 from both PaineWebber and Lehman Brothers.

in a securities transaction outside of the regular course or scope of his employment to provide written notice describing the proposed transaction, his role in the transaction, and whether he may receive selling compensation. *See* NASD Rule 3040; Pl.'s App. at 4 [23-4]. If the associated person receives selling compensation, he must obtain the member firm's prior written approval. *Id.*

Some of Browne's customers at PaineWebber and Lehman Brothers invested in e2 in 1999 and 2000. Around the same time, Browne received shares of e2 stock as compensation for his role as Advisory Director. Browne did not provide notice to or obtain approval from PaineWebber or Lehman Brothers in connection with at least some of this compensation.

In 2001, e2 began to falter. In January 2002, its employees filed involuntary bankruptcy proceedings against the company. Ultimately, e2 consented to a conversion to voluntary bankruptcy and reorganized. Due to e2's collapse and their resulting loss of investments, two of Browne's customers that invested in e2 – William P. Manning and Stephen K. Flory – initiated claims against him. Specifically, Manning filed an arbitration proceeding before NASD and Flory filed suit. As a result of these claims, NASD initiated an investigation and disciplinary proceeding (the "NASD Enforcement Proceeding").

*1. The Manning Arbitration.* – Manning filed an arbitration claim with NASD against Browne and PaineWebber. Among other claims, Manning alleged that Browne persuaded him to invest in private placements of e2 in violation of NASD rules. Browne notified Clarendon of this claim on March 23, 2003. Clarendon denied coverage on May 12, 2003

because, according to Clarendon, the claim did not allege any "wrongful act" by Browne in that the alleged conduct involved only acts he performed in his capacity as a securities representative for PaineWebber. Browne and Manning settled the complaint without Clarendon's involvement.

      *2. The Flory Litigation.* – Flory filed a lawsuit against Browne and others in Texas state court. Among other allegations, Flory claimed that Browne misrepresented that he "was receiving no compensation for fundraising and other services on behalf of e2." According to Flory: "In truth, Browne had a side agreement with Farris by which Browne would and did receive substantial compensation in the form of large equity positions in the Company. Browne also had an Advisory Director's agreement with e2 whereby he would receive unspecified compensation, which was also not disclosed to Flory." Pl.'s App. at 57-58 [23-2]. Browne notified Clarendon of this claim on or about December 29, 2003. Clarendon provided coverage for the dispute and ultimately settled the Flory litigation on Browne's behalf.

      *3. The NASD Enforcement Proceeding.* – NASD notified Browne by letter of its preliminary determination to recommend disciplinary action against him in December 2003. Pl.'s App. at 96. The letter alleged violations of NASD Conduct Rules 3040 and 2110 based on Browne's outside business activity with e2. NASD sent an additional letter in September 2004 stating: "At the time of our letter of December 5, 2003 inviting a 'Wells' submission, we did not have knowledge of your participation in transactions involving Stephen K. Flory." It continued:

> From March 2000 through October 2000, you participated in private securities transactions without notice to or approval from your firms. Specifically, your actions in relation to Stephen K. Flory and his company CBI Eastchase, L.P.'s purchase of e2 Communications, Inc. stock amounted to a private securities transaction. By virtue of such conduct, you violated NASD Conduct Rules 3040 and 2110.

Pl.'s App. at 99. Browne notified Clarendon of the NASD Enforcement Proceeding on January 20, 2005. Clarendon denied coverage about a month later on the ground that the claim alleged only acts by Browne in his uninsured capacity as a person associated with an NASD member firm.

NASD filed a formal complaint (the "NASD Complaint") on April 25, 2005. The NASD Complaint alleged that Browne received e2 shares as selling compensation in exchange for soliciting his clients to invest in e2 and, as a result, participated in those transactions. NASD sought a finding that Browne violated NASD rules, as well as sanctions, costs and disgorgement of any ill-gotten gains, or restitution. Pl.'s App. at 50 [23-3]. Browne provided Clarendon with a copy of the NASD Complaint and reurged his entitlement to coverage, but Clarendon maintained its coverage position.

The NASD Extended Hearing Panel found that Browne violated NASD Conduct Rules 2110 and 3040 by engaging in several private securities transactions in connection with e2 stock offerings without prior notice to or written approval from PaineWebber. NASD suspended Browne in all capacities as a securities representative and imposed a $25,000 fine. Pl.'s App. at 14 [23-4]. Browne appealed the decision. *Id.* at 20. On appeal, the National Adjudicatory Council of the Financial Industry Regulatory Authority ("NAC") affirmed the sanctions imposed by NASD. *Id.* at 18. Browne appealed the NAC's decision

to the Securities Exchange Commission ("SEC"). Ultimately, the SEC set aside NASD's findings of violations and imposition of sanctions because there was insufficient evidence that Browne participated in the transactions at issue and because NASD failed to provide sufficient notice of a new theory of liability it imposed on Browne. *Id.* at 47-62.

### *B. The Policy Language*

The Policy requires Clarendon to "pay to or on behalf of" the insured person "Loss arising from Claims" for "Wrongful Acts." Pl.'s App. at 27 [23]. Claims include arbitration or other dispute resolution proceedings as well as administrative or regulatory proceedings. *Id.* Loss includes defense costs.[5] *Id.* at 29. Finally, the Policy defines a wrongful act, in relevant part, as:

> (2) any other actual or alleged act, error, misstatement, misleading statement, omission or breach of duty . . . by an Insured Person in his or her capacity as a director, officer, member, manager or Employee of the Insured Organization or in an Outside Capacity; or
>
> (3) any matter claimed against an Insured Person solely by reason of his or her service (a) as a director, officer, member, manager or Employee of the Insured Organization, or (b) in an Outside Capacity.

*Id.* at 30-31.

The Policy includes two relevant exclusions: (A) and (J). It states:

---

[5]The Policy defines loss, in relevant part, as:
Defense Costs and any damages, settlements, judgments, back pay awards and front pay awards or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that an Insured is legally obligated to pay as a result of any Claim; provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed.
*Id.* at 29.

Unless otherwise specifically stated or provided for in CONDITION (D)(2)[6] or elsewhere in this Policy, the Insurer will not be liable to make any payment of Loss in connection with a Claim:

(A)    arising out of, based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply to an Insured only if there has been a final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage;

. . .

(J)    as a result of any portion of a Claim seeking relief or redress in any form other than money damages;

*Id.* at 31-32.

The parties dispute whether the Policy language obligates Clarendon to reimburse Browne for his defense costs arising out of the Manning arbitration and the NASD Enforcement Proceeding.

### C. The Instant Summary Judgment Motion

Clarendon moves for summary judgment that Browne cannot recover for either claim under the Policy. First, Clarendon argues that the statute of limitations bars Browne's claim for defense costs in the Manning arbitration. Second, Clarendon argues that the Policy language bars Browne's claim for defense costs in the NASD Enforcement Proceeding. Specifically, Clarendon argues that the allegations in the NASD Enforcement Proceeding did not involve a "wrongful act" by Browne because the conduct at issue did not occur in his capacity as e2's advisory director. In addition, it argues that Exclusion J precludes recovery

---

[6]Condition (D)(2) provides: "The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer." *Id.* at 37.

because NASD did not seek "money damages" in the disciplinary proceeding. The Court considers each of these arguments in turn.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, courts need not sift through the record in search of triable issues. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In doing so, the nonmovant may not rely on "naked assertions of an actual dispute" but instead "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *In re Lewisville Props., Inc.*, 849 F.2d 946, 950 (5th Cir. 1988) (citing *Anderson*, 477 U.S. at 255–56). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to

satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

### III. THE STATUTE OF LIMITATIONS BARS RECOVERY FOR THE MANNING ARBITRATION

Breach of contract and indemnity claims are subject to a four year statute of limitations in Texas. TEX. CIV. PRAC. & REM. CODE § 16.004(a)(3); *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 386 (5th Cir. 2007); *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 870 (Tex. 2007). This rule applies to insurance contracts. *See Beavers v. Metropolitan Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009).

The central dispute between the parties is the accrual date of Browne's claims. "[T]he accrual date is dispositive because it determines when the statute of limitations began to run on [the plaintiff's] causes of action, and consequently, whether the statute of limitations expired." *Smith Int'l*, 490 F.3d at 385-86. In Texas, where an insurance provider denies coverage, the limitations period starts to run at the time of denial. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 829 (Tex. 1990); *see also Merriman v. Security Ins. Co. of Hartford*, 100 F.3d 1187, 1193 (5th Cir. 1996). However, the Texas Supreme Court suggested that when "there is no outright denial of a claim, the exact date of accrual of a cause of action . . . should be a question of fact to be determined on a case-by-case basis." *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 221-22 (Tex. 2003) (quoting *Murray*, 800 S.W.2d at 828 n.2). In other words, "if an insurance company strings an insured

along without denying or paying a claim, limitations will be tolled." *Murray*, 800 S.W.2d at 828 n.2.[7]

Several Texas and federal courts have considered what constitutes "stringing an insured along" sufficient to toll the limitations period in light of *Murray*. Browne relies primarily on one such case, *Pena v. State Farm Lloyds*, in which a Texas court of appeals relied on the principle that "claims for additional payments may begin the statute of limitations running anew." 980 S.W.2d 949, 954 (Tex. App. – Corpus Christi 1998, no pet.). There, the insured submitted a claim for damages related to slab foundation movement in his home, which the insurer expressly denied. *Id.* Then, the insured made a second claim for foundation problems, which the insurance company paid in part. *Id.* The insurer denied requests for additional payments. *Id.* The *Pena* court held:

> Because the slab foundation problems were essentially ongoing, and its subsequent reinvestigation of and partial payment for the same reported problems, it appears the denial of the [first] claim was effectively reconsidered and withdrawn by State Farm, thus resetting the starting date for limitations to [the date the insurer denied the insured's request for additional payment based on the second claim].

*Id.*

Many courts have distinguished *Pena* since it was decided. *See, e.g.*, *Watson v. Allstate Texas Lloyd's*, 224 F. App'x 335, 340 (5th Cir. 2007); *Sheppard v. Travelers Lloyds of Tex. Ins. Co.*, 2009 WL 3294997, at *6-7 (Tex. App. – Houston [14th Dist.] 2009, pet.

---

[7]Various Texas courts of appeals have concluded that the quoted language from footnote 2 of *Murray* is dicta. *See, e.g.*, *Sheppard v. Travelers Lloyds of Texas Ins. Co.*, 2009 WL 3924997, at *4 (Tex. App. – Houston [14th Dist.] 2009, pet. denied); *Ehrig v. Germania Farm Mut. Ins. Assoc.*, 84 S.W.3d 320, 325 (Tex. App. – Corpus Christi 2002, pet. denied); *Kuzniar v. State Farm Lloyds*, 52 S.W.3d 759, 761 (Tex. App. – San Antonio 2001, pet. denied).

denied); *Pace v. Travelers Lloyds of Tex. Ins. Co.*, 162 S.W.3d 632 (Tex. App. – Houston

[14th Dist.] 2005, no pet.); *Stewart Title Guaranty Co. v. Hadnot*, 101 S.W.3d 642 (Tex.

App. – Houston [1st Dist.] 2003, pet. denied); *Mangine v. State Farm Lloyds*, 73 S.W.3d 467,

471 (Tex. App. – Dallas 2002, pet. denied).  For instance, in *Pace v. Travelers Lloyds of Tex.*

*Ins. Co.*, an insurer denied coverage, but invited the insured to supply additional information

on the coverage issue.  The court held that the contractual claim for coverage accrued on the

date of the denial letter, stating:

> Under [the insured's] interpretation of the letters, an insurer faced with a
> request for reconsideration of a denial of coverage would be put to the choice
> between refusing it outright, thereby risking a bad faith claim, or considering
> the request and restarting the limitations period.  We can find no authority or
> rationale to support such an approach (but only a potential for increasing
> litigation needlessly).

*Id.* at 634-35; *see Castillo v. State Farm Lloyds*, 210 F. App'x 390, 394 (5th Cir. 2006)

(holding that an insurer's willingness to review additional information, without changing its

position on any of the insured's claims, did not toll or extend the limitations period).  The

*Pace* court noted that the insured did not expressly or impliedly withdraw or change its

coverage decision, "such as by making payment or otherwise taking action inconsistent with

that decision."  *Id.* at 635.  Likewise, in *Sheppard*, the court reiterated the holding in *Pace*,

stating: "an invitation to provide additional information does not negate a prior denial.  Nor

is a prior denial negated by the possibility that the insurer may revisit the claim or change its

decision."  *Sheppard*, 2009 WL 3294997, at *6 (citing *Pace*, 162 S.W.3d at 634-35).

     Here, Clarendon denied coverage for the Manning Arbitration in a letter dated May

12, 2003.  It stated: "[b]ecause there is no coverage under the Policy for this matter,

Clarendon encourages you to take appropriate action to ensure that your interests are protected." Def.'s App. at 43 [15-3]. According to Clarendon and HCC, Browne's claims accrued at the time of this denial.

Browne, however, contends that Clarendon superseded or withdrew its denial of coverage in a June 2, 2005 settlement agreement resolving the Flory litigation, thereby tolling the limitations period. In the agreement, Browne and the other "Individual Defendants" agreed to release Clarendon:

> from any and all past, present or future obligations that Clarendon owes or may owe to the Individual Defendants under the Clarendon Policy, including any obligation to pay or reimburse any of the Individual Defendants for Loss as that term is defined in the Clarendon Policy, except Clarendon shall retain any obligation it has or may have pursuant to the terms and conditions of the Clarendon Policy to pay (1) Defense Costs in connection with any future Claims that may be made against the Individual Defendants; (2) Defense Costs incurred by the Individual Defendants in the Flory Suit and the Intervention Action that have not yet been reimbursed by Clarendon; and (3) for Loss, including Defense Costs, as those terms are defined in the Clarendon Policy, incurred by Browne in connection with the pending NASD complaint and *related prior NASD investigation that has been submitted to Clarendon for coverage*, to the extent that coverage for that matter is found to exist. The pending NASD complaint was issued on or about April 2005 and styled "Department of Enforcement v. Kevin Calandro and James W. Browne, Disciplinary Proceeding No. C05050015" before the NASD Office of Hearing Officers.

Pl.'s App. at 81-82 [23-3] (emphasis added). Browne asserts that the phrase "related prior NASD investigation that has been submitted to Clarendon for coverage" refers to the Manning Arbitration. According to Browne, by agreeing to exempt the Manning Arbitration from the release provision, Clarendon withdrew its previous denial and agreed to reconsider his claim. Thus, Browne argues that the statute of limitations accrued on June 2, 2005.

Even assuming, *arguendo*, that the release provision carves out the Manning Arbitration, Browne cannot demonstrate that Clarendon withdrew its May 2003 denial of his claim. The purpose of the exemption is to exclude the Manning Arbitration from the release, so that Browne may sue Clarendon for damages related to its denial of the claim. It does not, in any respect, imply that Clarendon will withdraw – or even reconsider – its original denial. Thus, *Pena* is inapplicable and, as in *Pace*, the insurer did not take action inconsistent with its original denial. Browne presents no evidence that Clarendon strung him along without denying or paying his claim.

Accordingly, the Court holds that the limitations period for Browne's Manning Arbitration claim accrued on May 12, 2003. An insurer need not "include 'magic words' in its denial of a claim if an insurer's determination regarding a claim and its reasons for the decision are contained in clear writing to the insured." *Provident Life*, 128 S.W.2d at 222. Clarendon clearly and unequivocally explained its coverage position and rationale in its May 12, 2003 letter. As the Court discussed, the release provision Browne cites in the 2005 settlement agreement does not withdraw or undermine Clarendon's clear denial. Thus, the four-year statute of limitations imposed by section 16.004(a)(3) of the Texas Civil Practice and Remedies Code bars Browne's Manning Arbitration claim.

## IV. THE POLICY DOES NOT BAR RECOVERY FOR THE NASD ENFORCEMENT PROCEEDING

When construing an insurance policy, Texas Courts use the ordinary rules of contract interpretation. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009) (citing *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex. 2004)).

The "cardinal concern is determining the parties' intent as reflected in the terms of the policy itself." *Id.* Thus, courts give policy language "its plain, ordinary meaning unless something else in the policy shows the parties intended a different, technical meaning." *Id.* (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008)). "No one phrase, sentence, or section [of the policy] should be isolated from its setting and considered apart from the other provisions." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)). If the language at issue is unambiguous, the Court "must enforce it as written. If, however, a contract is susceptible to more than one reasonable interpretation, [it] will resolve any ambiguity in favor of coverage." *Don's Bldg. Supply*, 267 S.W.3d at 23 (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)).

Here, Clarendon argues that Browne cannot recover for the NASD Enforcement Proceeding for two reasons: (1) the proceeding did not allege a "wrongful act" as defined by the Policy; and (2) Exclusion J of the Policy bars recovery for the claim because it sought relief or redress in a form other than money damages.

### A. The NASD Enforcement Proceeding Alleged a Wrongful Act as Defined by the Policy

The Policy covers loss resulting from a claim – including an administrative or regulatory proceeding – for a "wrongful act" by an insured person. Pl.'s App. at 29 [23]. The Policy defines a wrongful act, in relevant part, as:

> (2) any other actual or alleged act, error, misstatement, misleading statement, omission or breach of duty . . . by an Insured Person in his or her capacity as

a director, officer, member, manager or Employee of the Insured Organization
or in an Outside Capacity; or

(3) any matter claimed against an Insured Person solely by reason of his or her
service (a) as a director, officer, member, manager or Employee of the Insured
Organization, or (b) in an Outside Capacity.

*Id.* at 30-31.

The central dispute between the parties is whether the NASD Enforcement Proceeding involved activity by Browne "in his capacity" as Advisory Director of E2. Clarendon advances two arguments against coverage. First, it asserts that Browne's acts were wrongful, if at all, "only because [Browne] was a securities representative at an NASD firm, and acting as such." Defs.' Br. in Supp. of Mot. for Summ. J. at 24. Second, Clarendon argues that, as a matter of law, the NASD Enforcement Proceeding could not be based on Browne's acts in his insured capacity as Advisory Director because NASD had no jurisdiction to police his conduct as an advisory director of a non-NASD firm.

With respect to Clarendon's first argument, the Court disagrees. The Policy does not require that the acts alleged in the underlying claim occur exclusively in Browne's capacity as director of e2 in order to be "wrongful." In fact, the Policy includes two separate categories of "wrongful acts:" actual or alleged bad acts by an insured person "in his or her capacity" as a director; and any matter claimed against an insured person *solely* by reason of his or her service as a director.[8] Defs.' App. at 13. Thus, the fact that the NASD Enforcement Proceeding involved Browne's conduct as a member of a NASD firm in

---

[8] The Policy also provides coverage for officers, members, managers, or employees of the insured organization. Defs.' App. at 13.

addition to his activity as e2's advisory director does not negate Clarendon's coverage obligation.

Here, the NASD Enforcement Proceeding involved Browne's conduct in his capacity as e2's advisory director *as well as* his conduct as a securities representative at NASD member firms. The NASD Complaint alleged:

18.    During the period from December 1999 through March 2000, Browne solicited and/or referred 24 investors to E2, all as more full detailed on "Exhibit A," attached hereto.

19.    Six of the 24 investors that Browne solicited were Browne's member firm customers.

20.    After being solicited and/or referred to E2 by Browne, all 24 investors purchased securities issued by E2 in the aggregate amount of $1,780,996.

21.    Shortly after March 11, 2000 Browne accepted 10,177 common shares of E2 as compensation for his participation in the aforementioned private securities transactions. Browne's receipt of the 10,177 common shares constitutes selling compensation as defined in NASD Conduct Rule 3040.

. . .

25.    During the period from August 2000 through September 2000, Browne solicited public customer SF to purchase both e2 common shares in the aggregate amount of $300,000.47 from a private investor and e2 Series C Convertible Preferred Stock in the amount of $300,000 directly from e2. Browne also communicated with customer SF via electronic mail regarding the timing of the purchase of the shares, to whom and where the check should be sent.

26.    On March 5, 2001 e2 conducted a telephonic Board of Directors meeting.

27.    The minutes from the March 5, 2001 Board of Directors meeting reflect that Browne provided services in connection with the financing of [e2] and that e2 had negotiated the issuance of 150,000 shares of e2 common stock to Browne.

28.    In exchange for Browne's solicitation of public customer SF's purchases in the amount of $600,000.47, as well as Browne's service as an advisory director by facilitating the purchases, on March 5, 2001 e2 issued 150,000 shares of common stock to Browne.

29.    Browne's receipt of the 150,000 shares constitutes selling compensation as defined in NASD Conduct Rule 3040.

Pl.'s App. in Supp. of Resp. at 54-55 [23-3]. To summarize, NASD claimed that Browne – by soliciting investors in his capacity as an advisory director at e2, receiving compensation for such solicitation, and failing to notify and get approval from PaineWebber and Lehman Brothers regarding this activity – violated his duties as a securities representative of an NASD firm.[9]

The decisions that followed the NASD Complaint further illustrate the point that Browne's activity in his capacity as e2's advisory director formed a basis for the NASD investigation and disciplinary proceeding.[10]   For example, the first sentence of the decision of the NASD extended hearing panel is: "This case arose from an investigation of James W. Browne and Kevin Calandro's involvement with e2 Communications, Inc."  Pl.'s App. in Supp. of Resp. at 99.   The panel concluded: "In this case there is sufficient evidence of Browne's and Calandro's participation in private securities transactions in connection with the Series B Preferred Stock Offering. Each referred purchasers to e2, and each received a finder's fee for the effort."  *Id.* at 92 [23-4].   On appeal, the NAD affirmed the panel's

---

[9]Before NASD filed a formal complaint, it notified Browne of a formal investigation and disciplinary proceeding in connection with his efforts on behalf of e2.  *See* Pl.'s App. in Supp. of Resp. at 99 [23-2].

[10]Because this case involves a duty to indemnify, not a duty to defend, the Court looks to the facts as they were established in the underlying suit.  *See Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 2010 WL 2219645, at *10 (Tex. 2010) ("An insurer's duty to defend is determined under the eight-corners doctrine, while the duty to indemnify is determined by the facts as they are established in the underlying suit." (citing *D.R. Horton-Tex, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 744 (Tex. 2009)).

decision on appeal and stated: "Respondents engaged in a course of conduct on behalf of e2 Communications with the expectation that the individuals they introduced to e2 Communications would likely become investors and that Calandro and Browne would eventually be compensated for their efforts." *Id.* at 19. Although the SEC ultimately set the NASD and NAD decisions aside, they demonstrate that the allegations and factual inquiries at issue throughout the disciplinary proceeding involved Browne's activity in his capacity as an advisory director at e2.[11]

In addition, the Court is unpersuaded by Clarendon's second argument: that the nature of NASD Enforcement Proceeding precludes a coverage finding as a matter of law because NASD does not have jurisdiction to police Browne's conduct as e2's advisory director. The Policy does not restrict coverage based on the type of administrative or regulatory proceeding at issue or the jurisdiction of the regulatory body. Rather, it covers loss arising from claims for "wrongful acts." NASD's claim involved wrongful acts as required by the Policy language. Thus, Clarendon must indemnify Browne for the defense costs associated with the disciplinary proceeding unless an exclusion applies to bar Browne's recovery. The Court turns to whether Exclusion J limits Clarendon's coverage in this context.

### B. Exclusion J Does Not Bar Recovery

Clarendon bears the burden of proof to establish that a policy exclusion applies to bar Browne's claim. *See Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 293 S.W.3d 322, 325 (Tex. App. – Houston [14th Dist.] 2009, pet. filed) ("Because this case deals with

---

[11]A wrongful act under the Policy may be alleged or actual. In other words, Browne need only show that NASD's allegations involved his conduct as e2's advisory director.

exclusions, the appellant insurance company bears the burden of proof to establish that the exclusions apply in this case." (citing *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 204 (Tex. 2004))).  In the context of an exclusionary clause, "a court must adopt the construction urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."  *Id.* at 325.

Exclusion J provides that "the Insurer will not be liable to make any payment of Loss . . . as a result of any portion of a Claim seeking relief or redress in any form other than money damages."  Defs.' App. at 13-14.  Clarendon asserts that this provision bars recovery for defense costs because the NASD Complaint – which sought a declaration that Browne violated NASD rules, disgorgement of any ill-gotten gains, or restitution, sanctions, and costs in the Enforcement Proceeding – did not include a claim for "money damages."  Thus, the central dispute is whether sanctions and disgorgement or restitution damages constitute "money damages" as required by the Policy.[12]

The policy does not define "money damages."  Accordingly, the Court looks to the term's plain, ordinary meaning to determine whether it includes disgorgement or restitution, sanctions, and costs.  *See Tanner*, 289 S.W.3d at 831.

---

[12]In addition, NASD sought costs associated with the proceeding.  Although Clarendon mentions in passing that costs do not constitute "money damages," it offers no substantive analysis of the issue whatsoever.  It cites no legal authority or case law in support of its argument.  Because Clarendon failed to adequately brief the issue, the Court need not address it.  *See Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994) (citing *Villanueva v. CNA Ins. Cos.*, 868 F.2d 684, 687 n.5 (5th Cir. 1989)) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

ORDER – PAGE 19

**1. Disgorgement and/or Restitution.** – Clarendon argues that disgorgement of ill-gotten gains and restitution do not qualify as "money damages" for two reasons: (a) they are equitable in nature and therefore do not constitute "damages," and (b) they are uninsurable as a matter of public policy. Both arguments fail.

*(a) The Meaning of "Money Damages" in the Policy.* – First, Clarendon asserts that Exclusion J bars coverage because NASD's claim for restitution and/or disgorgement seeks relief in a "form other than money damages." Its central argument is that the term "money damages" incorporates the technical distinction between remedies available at law and remedies available in equity and includes only those available at law. Thus, Clarendon concludes that Exclusion J bars recovery for defense costs associated with NASD's claim for disgorgement or restitution because those remedies are equitable in nature.

The question before the Court, then, is: should it adopt the technical legal distinction between equitable remedies and legal damages when interpreting the word "damages" in an insurance contract? Various courts, including the Fifth Circuit, have addressed this general issue, primarily in the context of claims for reimbursement of environmental cleanup costs. In *Aetna Cas. & Sur. Co. v. Hanna*, 224 F.2d 499 (5th Cir. 1955), the insureds sought to recover costs and expenses associated with complying with a mandatory injunction that required them to remove fill material that spilled onto an adjoining lot. The Fifth Circuit considered whether the insureds' obligation constituted "damages" under the policy. It applied the word's "accepted technical meaning in law" and held that the policy covered "only payments to third persons when those persons [had] a *legal* claim for damages against

the insured on account of injury to or destruction of property." *Id.* at 503 (emphasis added).

Decades later, the Fourth Circuit, predicting Maryland law, relied on the reasoning in *Hanna*: "the best approach in construing the term 'damages' as contained in this insurance contract is to afford it the legal, technical meaning described in *Hanna*." *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348, 1352 (4th Cir. 1987). The court distinguished between damages – "a form of substitutional redress which seeks to replace the loss in value with a sum of money" – and restitution – "designed to reimburse a party for restoring the status quo." *Id.* at 1353. It concluded that the insurer need only indemnify the insured where it was obligated "to pay damages which result from injury, which in the insurance context means damages in the legal sense." *Id.* at 1354. Similarly, in *Cincinnati Ins. Co. v. Milliken and Co.*, the Fourth Circuit applied South Carolina law and followed *Armco*'s reasoning, stating "[w]e have no doubt that South Carolina law, in concert with Maryland and Missiouri, would recognize that a general comprehensive liability policy which obligated the insurer to pay 'all sums which the insured shall become legally obligated to pay as damages' would not cover claims for which the insured is equitably obligated to pay." 857 F.2d 979, 981 (4th Cir. 1988).

However, Maryland and South Carolina's highest courts later rejected the Fourth Circuit's reasoning – and, implicitly, the Fifth Circuit's analysis in *Hanna* – because policy language should receive its plain, ordinary meaning rather than a narrow, technical one. *See Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1022-23 (Md. 1993) ("The reasonably prudent layperson does not cut nice distinctions between the remedies offered at

law and in equity.  . . . The ordinary person understands 'damages' as meaning money paid to make good an insured loss."); *Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 594 S.E.2d 455, 458 (S.C. 2004) ("An 'ordinary' meaning of the term is not a legalistic one dependent on whether the damages are classified as legal versus equitable.").  Texas courts rely on the same interpretive canon. *See Tanner*, 289 S.W.3d at 831 (Policy language should receive "its plain, ordinary meaning unless something else in the policy shows the parties intended a different, technical meaning.").

The Fifth Circuit revisited the issue in *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1053 (5th Cir. 1996), and *SnyderGeneral Corp. v. Century Indem. Co.*, 113 F.3d 536, 538-39 (5th Cir. 1997).  In *Bituminous*, the Court held that government cleanup costs incurred in responding to the dumping of hazardous wastes on property, imposed and insured by CERCLA, are "damages."  75 F.3d at 1053.[13]  In *SnyderGeneral*, the Court interpreted Texas law and found *Bituminous* dispositive with respect to whether the term damages incorporates the distinction between legal damages and equitable relief:

> Century contended, and the district court agreed, that the term damages in its policy referred to the technical distinction between legal damages and equitable relief.[14]  Consequently, SnyderGeneral's environmental cleanup costs, which the court characterized as restitution or reimbursement, did not qualify as damages.
> An intervening decision by this court is dispositive of the issue presented herein. In *Bituminous Casualty Corp. v. Vacuum Tanks, Inc.*, an insurer contended that it did not have a duty to defend its insured in a suit by

---

[13]The court noted: "Most, but not all, federal courts construing the law of various states agree."  *Id.* at 1053-54 (collecting cases).

[14]The district court relied, in part, on *Hanna* in making its decision.  *See SnyderGeneral Corp. v. Century Indem. Co.*, 907 F.Supp. 991, 1004 (N.D. Tex. 1995).

the federal government under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). In that action the government sued the insured for expenses incurred in cleaning up environmental contamination at a facility where the insured delivered hazardous waste. The insurer contended that such cleanup costs constituted economic injury and, as such, did not qualify as damages under its policy. We held, however, that environmental cleanup costs imposed on an insured by CERCLA were damages.

113 F.3d at 538-39 (footnotes omitted). Thus, the Court held that the term damages included reimbursement of environmental cleanup costs. *Id.*

Here, the insured seeks defense costs associated with a claim for restitution and disgorgement, not reimbursement of environmental cleanup costs. Clarendon cites no controlling precedent with respect to whether the term "damages" in this context includes these forms of equitable relief.

Although there is no binding Texas state law directly on point, two cases offer additional guidance to the Court. In *Samsung Elecs. Am., Inc. v. Fed. Ins. Co.*, 202 S.W.3d 372 (Tex. App. – Dallas 2006, *aff'd on other grounds*, 268 S.W.3d 506 (Tex. 2008)),[15] the plaintiffs that sought relief in the form of a cellphone headset or its reasonable value. The Court concluded that the "cost of a headset is not clearly within or excluded by the definition of 'damages' in [the insurer's] policies." *Id.* at 382. Thus, it held that the insurer had a duty to defend the underlying claim. *Id.* Further, in *Lamar Homes, Inc. v. Mid-Continent Cas.*

_____

[15]The Texas Supreme Court affirmed *Samsung* on grounds explained in *Zurich Am. Ins. Co. v. Nokia*, 268 S.W.3d 487 (Tex. 2008), a companion case. *See Fed. Ins. Co. v. Samsung Elecs. Am.*, 268 S.W.3d 506, 507 (Tex. 2008). In *Zurich*, the Court declined to consider whether a claim seeking headsets was a claim for damages: "We need not decide, however, whether headsets qualify as damages, because although each of the complaints seeks compensation for the cost of headsets, they also assert that the plaintiffs have been injured and seek damages based on their physical exposure to radiation." *Zurich*, 268 S.W.3d at 494.

ORDER – PAGE 23

*Co.*, 242 S.W.3d 1 (Tex. 2007), the Texas Supreme Court declined to adopt a technical or specialized meaning of the term "property damage" that would exclude damages for contractual, economic losses:

> Contrary to the carrier's contentions, the CGL policy makes no distinction between tort and contract damages. The insuring agreement does not mention torts, contracts, or economic losses; nor do these terms appear in the definitions of "property damage" or "occurrence." The CGL's insuring agreement simply asks whether "property damage" has been caused by an "occurrence." Therefore, any preconceived notion that a CGL policy is only for tort liability must yield to the policy's actual language.

*Id.* at 13. Although these cases arise in a different context, they inform the Court's analysis with respect to whether it should adopt a technical meaning of the term "money damages."

In light of *Bituminous* and *Snyder*, the Texas canon affording contract terms their plain and ordinary meaning, Texas cases declining to adopt a technical definition, the Texas rule that uncertainties should be decided in favor of the insured, and the fact that the language at issue appears in an exclusion, the Court declines to adopt the technical legal distinction between equitable remedies and legal damages when interpreting the word "damages" in the Policy. Thus, the Court holds that Exclusion J does not bar recovery of defense costs associated with NASD's claims for restitution or disgorgement.

Additionally, if the Court were to construe the term "money damages" to exclude equitable remedies from coverage, it would render another portion of the policy – Exclusion (A) – redundant. Exclusion (A) states:

> Unless otherwise specifically stated or provided for in Condition (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make payment of Loss in connection with a Claim:

>(A)    arising out of, based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided that this EXCLUSION (A) will apply to the Insured only if there has been a final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage . . . .

Pl.'s App. at 31 [23]. From this provision, it appears that the parties intended the Policy to cover those claims arising out of, based upon, or attributable to an ill-gotten gain where the final adjudication is in favor of the insured.

Claims arising out of, based upon, or attributable to the gaining of a profit or advantage to which the insured was not legally entitled generally provide for equitable remedies. *See, e.g.*, *S.E.C. v. Huffman*, 996 F.2d 800 (5th Cir. 1993) ("Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." (citations omitted)); *ERI Consulting Eng'rs, Inc. v. Swinnea*, 2010 WL 1818395, at *3 (Tex. 2010) ("Accordingly, courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty. For instance, courts may disgorge all ill-gotten profits from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal, or competes with a principal."); *see also Great-West Life & Annuity Ins. Co v. Knudson*, 534 U.S. 204, 212-15 (2002) (discussing the distinction between equitable remedies and legal damages in the context of a claim seeking restitution under ERISA); *Amschwand v. Spherion Corp.*, 505 F.3d 342, 348 (5th Cir. 2007) (same).

Thus, if the Court construes "money damages" to exclude all equitable forms of relief, then Exclusion (J) would wipe out the claims that Exclusion (A) addresses, including

circumstances where, as here, there is a final adjudication *in favor* of the insured.  The Court declines to interpret the Policy in a way that renders Exclusion (A) superfluous.  *See Christus Spohn Health Sys. Corp. v. Nueces County Hosp. Dist.*, 39 S.W.3d 626, 629-31 (Tex. App. – Corpus Christi 2000, no pet.) ("In construing a contract, we must attempt to give effect to all contract provisions so that none will be rendered meaningless." (citing *Kelley-Coppedge, Inc. v. Highland Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998))).  Thus, the Court holds that NASD's underlying claims for restitution and/or disgorgement are claims for "money damages" under the Policy and therefore fall within Clarendon's coverage obligation.

(b) *Public Policy Construction.*  – Clarendon's second argument is that claims seeking restitution or disgorgement are uninsurable as a matter of law in Texas and, therefore, Browne cannot recover the costs associated with defending those claims.  To support its point, Clarendon relies on cases that considered whether restitution or disgorgement constituted a "loss" under the terms of an insurance policy.  For example, in *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, the court held that a judgment requiring an insured to pay for oil that it removed from adjacent land by drilling a slant well was not a "loss."  456 S.W.2d 489 (Tex. App. – Dallas 1970, no writ).  The court explained:

> An insured (under such a policy as we have here) does not sustain a covered loss by restoring to its rightful owners that which the insured, having no right thereto, has inadvertently acquired . . . .  The insurer did not contract to indemnify the insured for disgorging that to which it was not entitled in the first place, or for being deprived of profits to which it was not entitled.

*Id.* at 494.  Likewise, the Seventh Circuit addressed whether a settlement requiring the return of money obtained by alleged fraud constituted a "loss" in *Level 3 Communications Inc. v.*

*Federal Insurance Company*, noting that the "insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." 272 F.3d 908, 911 (7th Cir. 2001). Finally, the Fifth Circuit recently considered this issue in *U.S. Bank Nat. Assoc. v. TransTexas Gas Corp.* (*In re TransTexas Gas Corp.*), 597 F.3d 298, 308-310 (5th Cir. 2010). Under the terms of the executive and organization liability policy at issue in *TransTexas*, "loss" included "damages, settlements, judgments (including pre/post-judgment interest on a covered judgment), Defense Cost and Crisis Loss," but not "matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed." *Id*. at 309. The parties disputed whether a judgment requiring repayment of amounts received through fraudulent transfers constituted a loss under the policy. *Id*. The court held that it did not, citing *Nortex* and *Level 3 Communications*. *Id*. at 309-10.

Here, however, the question presented is different. Browne does not seek indemnification for restitution or disgorgement amounts. He owes none. Rather, he seeks defense costs associated with the NASD Enforcement Proceeding, which ended in his favor.

Under the terms of the Policy, defense costs are a covered loss regardless whether restitution or disgorgement is insurable under Texas law. The Policy requires Clarendon to "pay to or on behalf of" the insured person "Loss arising from Claims" for "Wrongful Acts." Pl.'s App. at 27. The Policy defines loss as:

> Defense Costs **and** any damages, settlements, judgments, back pay awards and front pay awards or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that an Insured is legally obligated to pay as a result of any

Claim; provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed.

*Id.* at 29 (emphasis added).  It defines defense costs as:

reasonable legal fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a Claim against an Insured, but excluding salaries, wages, benefits or overhead expenses of any Insured Person.

*Id.* at 28.

Clarendon does not argue that the defense costs Browne seeks are uninsurable as a matter of law, but rather argues that Browne cannot recover defense costs associated with a claim for uninsurable damages.  However, based on the above-quoted Policy language, defense costs arising out of a claim for a wrongful act constitute losses *regardless* whether they are associated with defending an uninsurable claim.[16]   The Court notes this is substantially different from a duty to defend policy.  In that context, the duty to defend is distinct from the duty to indemnify; the carrier has a duty to defend if the complaint alleges a covered claim.  *See, e.g.*, *Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*, 592 F.3d 687, 691 (5th Cir. 2010).  In the Policy, Clarendon chose to define wrongful acts more broadly than loss.  It agreed to indemnify defense costs, a loss, incurred in connection with a claim for a wrongful act, regardless whether the damages ultimately awarded would fit

---

[16]Under Exclusion J, defense costs incurred in defending a claim seeking relief in a form other than money damages are not recoverable.  *See* Pl.'s App. at 32 (Clarendon is not liable to pay loss incurred as a result of "any portion of a Claim seeking relief or redress in any form other than money damages.").  Here, the Court has already determined Exclusion J does not apply to NASD's claims for restitution or disgorgement.

ORDER – PAGE 28

within the definition of loss.[17]  Here, Browne suffered a loss – reasonable legal fees – arising

from a claim for a wrongful act.[18]  Thus, the Court need not consider whether the restitution

and disgorgement amounts that NASD unsuccessfully sought would also have constituted

a loss.  Based on the policy language, Clarendon must pay defense costs in any event.

The public policy concerns that informed the interpretation of the word "loss" in the

cases Clarendon cites do not apply in this context. Here, the insured is not seeking to recover

amounts to which he was never legally entitled, as was the case in *Nortex*, *Level 3

Communications*, and *TransTexas*.  Rather, the insured is seeking to recover defense costs

associated with a successful defense.  A central function of D&O policies is to protect the

insured against illegitimate or unsupportable claims.   As the Texas Supreme Court

recognized:

> Moreover, it makes little sense to say that [the insurer] has agreed to pay the
> insured's attorneys' fees when suits have been unsuccessfully defended and its
> has thereby been required to make heavy indemnity payments, but that it has
> not agreed to pay attorneys' fees when suits have been successfully defended
> and it has thereby been protected against heavy indemnity payments.

*National Sur. Corp. v. First Nat. Bank of Midland*, 431 S.W.2d 353, 355 (Tex. 1968).

In sum, the Court holds that Clarendon is required to indemnify Browne for defense

costs associated with successfully defending against NASD's claim for restitution or

disgorgement.

---

[17]Exclusion J illustrates that Clarendon knows how to exclude liability for attorneys' fees if
the underlying damages would not be covered when it wants to do so; it did not do so with respect
to the claims for restitution or disgorgement.

[18]The Court has already determined that the NASD Enforcement Proceeding was a claim for
a wrongful act.  *See supra* section IV(A).

ORDER – PAGE 29

*2. Sanctions.* – The NASD complaint also sought "an order imposing sanctions upon the Respondents in accordance with NASD Rule 8310." Pl.'s App. at 56-57 [23-3]. The rule allows NASD, now FINRA, to:

(1)    censure a member or person associated with a member;

(2)    impose a fine upon a member or person associated with a member;

(3)    suspend the membership of a member or suspend the registration of a person associated with a member for a definite period or a period contingent on the performance of a particular act;

(4)    expel a member, cancel the membership of a member, or revoke or cancel the registration of a person associated with a member;

(5)    suspend or bar a member or person associated with a member from association with all members;

(6)    impose a temporary or permanent cease and desist order against a member or a person associated with a member; or

(7)    impose any other fitting sanction.

FINRA RULE 8310. The only one of these sanctions that could be understood to require payment of "money damages" is (2), which allows NASD to impose a fine upon a member. Thus, the Court must determine whether the term "money damages" includes fines.

Again, Clarendon asks the Court to adopt a technical approach to the definition of money damages. In this context, Clarendon argues that the term damages includes only compensatory relief and, therefore, excludes a civil fine because it is punitive in nature. The Texas Supreme Court faced a similar argument, albeit in a different context, in *Horizon/CMS Healthcare Corp. v. Auld*, 23 S.W.3d 887, 892 (Tex. 2000). There, the defendant argued that the term "damages" in the Medical Liability Improvement Act referred exclusively to compensatory relief and, therefore, did not include punitive damages. Surveying the common law, the Court concluded that it provided "no meaningful guidance regarding whether punitive damages should be included in a common-law definition of 'civil liability

for damages.'" *Horizon/CMS Healthcare Corp. v. Auld*, 23 S.W.3d 887, 892 (Tex. 2000) (collecting cases). Thus, the Court turned to the legislative history of the statute to determine the legislature's intent with respect to the scope of the term. In other words, the *Auld* court recognized uncertainty in Texas law with respect to whether the term damages refers exclusively to compensatory relief.

Moreover, the Policy is unclear with respect to whether the parties intended the term "money damages" to include only compensatory relief. To the extent that Clarendon, the drafter, wished to exclude any loss – including defense costs – incurred as a result of any portion of a claim seeking redress in any form other than *compensatory* damages, Clarendon could have said so explicitly in the Policy. *See, e.g.*, *United Nat. Ins. Co. v. City of St. Gabriel, La.*, 2009 WL 1405849, at *5 (M.D. La. 2009). Or, it could have defined the term "money damages." *See, e.g.*, *Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*, 2010 WL 772299, at *4 (N.J. Super. 2010). Finally, it could have excluded defense costs associated with claims seeking redress in the form of a fine or penalty.[19] It did none of these things and, as a result, the Policy offers no guidance with respect to the meaning of "money damages." Considering this uncertainty, the Court construes the policy in favor of the insured and holds that Clarendon is liable for Browne's defense costs associated with the portion of NASD's claim seeking sanctions in the form of a fine.

---

[19]In fact, Clarendon explicitly excluded fines and penalties from its definition of loss. *See supra* section I(B). However, as the Court discussed above, the Policy does not require the underlying claim to be insured to trigger the payment of defense costs. *See supra* section IV(B)(1)(b).

ORDER – PAGE 31

**V. SOME OF BROWNE'S CLAIMS UNDER CHAPTER 542 OF THE INSURANCE CODE FAIL**

Browne also seeks interest and attorneys' fees under the "prompt payment" provisions in Chapter 542 of the Texas Insurance Code. TEX. INS. CODE ANN. §§ 542.051-.061. An insurer is not liable for violation under this chapter unless it is liable for the underlying insurance claim. *See Harris v. Am. Prot. Ins. Co.*, 158 S.W.3d 614, 623 (Tex. App. – Fort Worth 2005, no pet.); TEX. INS. CODE ANN. § 542.060. Thus, the Court grants Clarendon's motion for summary judgment on Browne's claims under the Texas Insurance Code to the extent that it holds that Clarendon is not liable to pay Browne's defense costs. Specifically, the Court grants Clarendon's motion for summary judgment on the Insurance Code claims with respect to the Manning Arbitration and denies its motion with respect to the NASD Enforcement Proceeding.

**CONCLUSION**

For the reasons provided above, the Court grants in part and denies in part Clarendon's motion for summary judgment.

Signed August 30, 2010.

David C. Godbey
United States District Judge

ORDER – PAGE 32